**UNITED STATES BANKRUPTCY COURT**　　　　　　**NOT FOR PUBLICATION**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------x
In re:　　　　　　　　　　　　　　　　　　:　　Chapter 7
　　　　Charlie Wenhai Xiao,　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Debtor.　　　　　　:　　Case No. 22-11540 (JLG)
------------------------------------------------------------------------x
Charlie Wenhai Xiao,　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Plaintiff,　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
v.　　　　　　　　　　　　　　　　　　　　　:　　Adv. P. No.: 24-01311 (JLG)
　　　　　　　　　　　　　　　　　　　　　　:
United States Department of Education　　　　　　:
and Nelnet,　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　　　　　　　　　　:
　　　　　　　　　　　　　Defendants.　　　　:
------------------------------------------------------------------------x

### MEMORANDUM DECISION AND ORDER RESOLVING
### CROSS-MOTIONS FOR SUMMARY JUDGMENT

**A P P E A R A N C E S :**

DAMIAN WILLIAMS
United States Attorney, Southern District of New York
*Attorney for United States Department of Education*
86 Chambers Street, Third Floor
New York, New York 10007
By:　　Tara Schwartz

CHARLIE XIAO
*Appearing Pro Se*
314 East 19th Street
New York, NY 10003

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

### INTRODUCTION[1]

Charlie Wenhai Xiao (the "Debtor" or "Plaintiff") is a pro se Chapter 7 debtor. On November 21, 2022 (the "Petition Date"), he filed a voluntary petition (the "Chapter 7 Petition") commencing a case under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in this Court (the "Chapter 7 Case").[2] As of the Petition Date, the principal balance of his federal student loan debt totaled $76,030 (the "Prepetition Federal Student Loan Debt"). On February 23, 2023, the Court entered an order of discharge under section 727 of the Bankruptcy Code and closed the Chapter 7 Case.[3]

On November 22, 2023, Debtor moved to reopen the Chapter 7 Case to file an adversary proceeding to discharge his student loan debt.[4] By that time, after the Petition Date, Debtor had incurred additional student loan debt totaling $75,000 (the "Post Petition Federal Student Loan Debt," together with the Prepetition Federal Student Loan Debt, the "Federal Student Loan Debt"). On January 31, 2024, the Court granted Plaintiff's motion.[5] That day, Plaintiff filed his complaint (the "Complaint"),[6] commencing this adversary proceeding against the United States Department of Education (the "DOE") and Nelnet. In the Complaint, Plaintiff is seeking a determination that

---

[1] Capitalized terms have the meanings ascribed to them herein.

[2] *Chapter 7 Voluntary Petition for Individuals, In re Xiao*, No. 22-11540 (Bankr. S.D.N.Y. Feb. 23, 2023), ECF No. 1. References to "ECF No.   " are to documents filed on the electronic docket of the Chapter 7 Case. References to "AP ECF No.__" are to documents filed on the electronic docket of this Adversary Proceeding, No. 24-01311.

[3] *Discharge of Debtor(s) and Order of Final Decree*, ECF No. 13.

[4] *Motion to Reopen Case*, ECF No. 16.

[5] *Order Granting Motion to Reopen Chapter 7 Case*, ECF No. 19.

[6] *Complaint to Determine the Dischargeability of Federal Student Loan Due to Undue Hardship Under 11 U.S.C. § 523(a)(8)*, AP ECF No. 1.

his Federal Student Loan Debt is dischargeable under section 523(a)(8) of the Bankruptcy Code. The principal amount of the debt is $151,030. The debt is accruing interest.[7] DOE filed its Answer[8] to the Complaint.

Before the Court are Plaintiff's and DOE's cross motions for summary judgment. DOE seeks summary judgment denying Plaintiff a discharge of his Federal Student Loan Debt. It argues that the debts are presumptively nondischargeable in bankruptcy and that Plaintiff cannot meet any prong of the three prong test (the "*Brunner* Test") set out in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) ("*Brunner*"), to show that repaying his student loans would impose an undue burden on him (the "DOE Motion").[9] It also contends that as a matter of law, the Post Petition Federal Student Loan Debt is not dischargeable under section 727(b) of the Bankruptcy Code, irrespective of whether Plaintiff can demonstrate that It will be a hardship for him to repay that debt. It has filed the declarations of Tara Schwartz[10] and Phillipe Guillon (the "Guillon Declaration" or "Guillon Decl.") in support of the motion.[11]

Plaintiff opposes the DOE Motion, and in his cross-motion seeks summary judgment that the Federal Student Loan Debt is not exempt from discharge under section 523(a)(8) of the Bankruptcy Code (the "Xiao Motion").[12] In substance, Plaintiff says that he has met his burden

---

[7] The amount of the interest is not material to the resolution of the cross motions for summary judgment. In resolving the motions, the Court will address the principal amount of the Federal Student Loan Debt, without accounting for the accrued interest.

[8] *Answer of the United States Department of Education*, AP ECF No. 10.

[9] *Motion and Memorandum of Law in Support of the U.S. Department of Education's Motion for Summary Judgment*, AP ECF No. 28.

[10] *Declaration of Tara Schwartz*, AP ECF No. 26.

[11] *Declaration of Phillipe Guillon*, AP ECF No. 25.

[12] *Opposition to Motion and Cross-Motion for Summary Judgment Pursuant to Local Bankruptcy Rule 7056-1*, AP ECF No. 29.

under the *Brunner* Test to demonstrate that it would impose an undue hardship on him to repay the Federal Student Loan Debt. He also says that the Post Petition Federal Student Loan Debt is dischargeable under section 727(b) because he incurred the indebtedness before he filed the Complaint commencing this adversary proceeding. Alternatively, he asks the Court to discharge a "substantial portion" of the debt, leaving him with a "nominal amount" of monthly loan payments. He filed a declaration in support of the motion (the "Xiao Decl.").[13] DOE filed a reply in opposition to the Xiao Motion and in further support of its motion (the "DOE Reply").[14] Plaintiff filed a reply in further support of his motion (the "Xiao Reply").[15] The parties filed a joint statement of material undisputed facts (the "Joint Statement").[16]

The Court heard argument on the cross-motions. For the reasons set forth herein, the Court grants the DOE Motion, and dismisses the Complaint. The Court denies the Xiao Motion.

## <u>JURISDICTION</u>

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157(a) and (b)(1) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

---

[13] *Declaration of Charlie Wenhai Xiao*, AP ECF No. 30.

[14] *Reply Memorandum of Law in Support of the U.S. Department of Education's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Summary Judgment*, AP ECF No. 34.

[15] *Reply to Defendant's Opposition to and Further Support of Plaintiff's Cross-Motion for Summary Judgment*, AP ECF No. 37.

[16] *Joint Statement of Material Undisputed Facts Pursuant to Local Bankruptcy Rule 7056-1*, AP ECF No. 24. Plaintiff signed the Joint Statement. *Id*. at 14.

**FACTS**[17]

**Plaintiff's Background**

Plaintiff is 54 years old, lives alone, and has no dependents. Joint Statement ¶¶ 1, 21. He has two adult children who live independently, though from time to time he provides financial support to one of his adult sons. *Id.* ¶ 21. In 1992, Plaintiff received a bachelor's degree in English and Economics from a college in China. *Id.* ¶ 2. In 1994, Plaintiff moved to the United States to continue his education at the University of Rochester, where in 1996, he earned a Master of Business Administration ("MBA") degree. *Id.* ¶¶ 3-4. Plaintiff paid for his MBA degree with the assistance of family members and scholarship. *Id.* ¶ 5. He did not take out any commercial or federal loans for his MBA studies. *Id.*

After earning his MBA, Plaintiff worked as a junior budget analyst at the University of Rochester Medical Center. *Id.* ¶ 6. In 2001, Plaintiff became a Certified Public Accountant ("CPA") in New York State. *Id.* ¶ 7. From 2001 to 2016, Plaintiff held various positions as a CPA, earning a maximum annual salary of $100,000. *Id.* ¶¶ 8-9. In around June 2016, Plaintiff was laid off, and for the next year and a half, Plaintiff performed accounting-related work on a contract basis and worked as a ride-share driver. *Id.* ¶¶ 10-11.

**Plaintiff's Nursing Education**

By the end of 2017, Plaintiff decided to change careers and work in the mental health field. *Id.* ¶ 12. In January 2018, Plaintiff enrolled at various community colleges to take prerequisite courses to pursue a degree in nursing. *Id.* ¶ 13. In January 2021, Plaintiff obtained a Bachelor of Science in Nursing from Lehman College. *Id.* ¶ 14. Following his graduation, Plaintiff entered a part-time program to obtain a Master of Science in Nursing at the New York University Rory

---

[17] The Court draws its account of the facts from the Joint Statement.

Meyers College of Nursing ("NYU"). *Id.* ¶ 15. During his first two years of the NYU nursing program, Plaintiff also worked as a registered nurse at Veritas Collaborative (October 2021 through April 2022), where his salary was more than $60,000, and Bellevue Hospital (June 2022 through June 2023), where his salary was $85,000. *Id.* ¶ 18. At the start of his third year at NYU, Plaintiff quit his full-time position at Bellevue Hospital and took unpaid internships to prepare for his career. *Id.* ¶ 19. From June 2023 through May 2024, Plaintiff participated in unpaid internships at various hospitals and clinics including NYU Langone Brooklyn, Hamilton-Madison House at Lower East Side on Manhattan, Flushing Hospital, and Jamaica Hospital. *Id.* In May 2024, Plaintiff received his graduate nursing degree from NYU. *Id.* ¶ 17.

**Plaintiff's Student Loans**

***The Private Student Loan***

On July 20, 2020, Plaintiff took out a private student loan from Sallie Mae in the amount of $11,800 (the "Private Student Loan") to fund his studies at Lehman College. Joint Statement ¶¶ 37-38. As of the Petition Date, the balance on the loan was $10,345; the loan was not discharged in the Chapter 7 Case. *Id.* ¶¶ 39-40. On or around June 14, 2023, Plaintiff paid off the loan in full. *Id.* ¶ 41.

***The Federal Student Loans***

Plaintiff holds seventeen loans from DOE (the "Federal Student Loans"). As of the Petition Date, DOE had disbursed ten loans to Plaintiff. Specifically, between July 2019, and August 2020, Plaintiff took out six federal loans to fund his undergraduate nursing studies at Lehman. Joint Statement ¶ 27. The total principal balance on those loans is $25,000. *Id.* ¶ 28. And between May and August 2022, Plaintiff took out an additional four federal loans totaling $51,030, to fund his studies at NYU. *Id.* ¶ 29-30. The total principal balance on those loans is $51,030. *Id.* ¶ 30. Thus,

as of the Petition Date, the principal amount of Plaintiff's Federal Student Loan Debt was $76,030. *Id.* ¶ 31. After the Petition Date, between March 21, 2023, and January 15, 2024, Plaintiff took out an additional seven federal loans to fund the remainder of his studies at NYU. *See id.* ¶ 32. The principal balance on these additional seven loans is $75,000. *See id.* ¶ 33.

**Plaintiff's Current Income and Current Expenses**

Beginning August 12, 2024, and as of the commencement of this adversary proceeding, Plaintiff was employed as a psychiatric nurse practitioner at Flushing Hospital, at an annual salary of $134,000. *Id.* ¶¶ 42-43. After contributing his maximum allowable 403(b) retirement plan amount of $2,542 per month, and deducting city, state, and federal taxes, medicare, and social security, Plaintiff's monthly take home pay was $5,893.64. *Id.* ¶¶ 47-48.

Plaintiff's monthly expenses total $2,630. They include $830 in rent, $900 for food, $300 for household supplies and personal hygiene, $200 for transportation, $250 for a family cellphone plan, $100 for dietary supplements, and $50 for health insurance. *Id.* ¶¶ 51-58. Plaintiff suffers from insomnia, prediabetes, and anemia, and he believes he has a genetic risk for dementia. *Id.* ¶¶ 57, 91. Plaintiff does not receive regular treatment or take medications for any of these conditions. *Id.* ¶ 57. Plaintiff estimates that he provides an average of $750 per month in financial support to one of his adult sons. *Id.* ¶ 59.

**Plaintiff's Projected Future Income and Future Expenses**

Plaintiff believes that, in the foreseeable future, he will not find work in his field that will pay him more than an annual salary of $134,000. Joint Statement ¶ G.53.[18] He believes he has very limited opportunities for promotions. *Id.* Plaintiff recognizes other hospitals may pay more than

---

[18] Section F of the Joint Statement consists of paragraphs 50-60. Section G of the Joint Statement consists of two paragraphs numbered 53 and 54, respectively. Section H follows the sequence in section F beginning at paragraph 61. The Court will refer to the Section G paragraphs as "¶ G.53" and "¶ G.54."

Flushing Hospital. ¶ G.54. However, he insists that even with increased experience, he does not foresee employment opportunities of increase salaries, given the dynamic nature of the labor market. *Id.* ¶¶ G.53-54. Accordingly, his projects his monthly take home pay as a psychiatric nurse practitioner will not exceed $5,893.64. *Id.* ¶ 82. Plaintiff plans to work for twenty more years, so long as he remains in good health. *Id.* ¶ 91.

Plaintiff will have to find other housing in July 2025, and he anticipates relocating to a studio apartment in Manhattan. *Id.* ¶ 61. He projects his rent to increase to approximately $2,500 per month, and, after accounting for utilities, he expects to pay approximately $2,700 per month for housing. *Id.* ¶ 62. He wants to continue living in Manhattan (i) to be closer to the communities he served when he interned in lower Manhattan and Brooklyn, so that he can continue to serve those communities, and (ii) to be closer to the Psychoanalytic Institute in Manhattan where he intends to continue his post-graduate studies, and the NYU Nursing School community. *Id.* ¶¶ 63, 65. Plaintiff also believes living in Manhattan is better for his physical and mental health because it provides him with easy access to healthier food and quieter environment. *Id.* Plaintiff will not consider living in Queens or Brooklyn. *Id.* ¶ 63.

Plaintiff intends to continue to maximize his retirement contribution of $2,542 per month. *Id.* ¶ 68. His other projected monthly expenses include $900 for food, $300 for household supplies and personal hygiene, $75 for a cellphone plan, $250 for out-of-pocket medical and dental costs, $50 per month on professional liability insurance, $200 for transportation, $100 for entertainment, $900 for work and professional expenses and other emergency expenses, and $925 per month for continuing education programs and professional development. *Id.* ¶¶ 69-78. In total, on average, Plaintiff projects expenses of $6,325 per month. *Id.* ¶ 81.

**Plaintiff's Loan Repayment Plan**

The standard monthly payment amount on his seventeen student loans is $1,785.60 (the "Standard Monthly Payment"), with a ten-year loan repayment period (the "Repayment Period"). Guillon Decl. ¶ 23. Plaintiff's first payment on those debts became due on February 15, 2025, after the post-graduation grace period ended. Joint Statement ¶ 36. He has not made any payments on account of his Federal Student Loan Debt. *Id.* ¶ 35.

Prior to the Petition Date, Plaintiff anticipated applying for and receiving loan assistance from the Nurse Corps Loan Repayment Program. *Id.* ¶ 83. Applicants who are accepted in the Nurse Corps Loan Repayment Program may be eligible and receive loan assistance for up to 85% of their federal student loan debt. *Id.* ¶ 84. Plaintiff has not applied for the program because he understands that his bankruptcy filing constitutes a negative credit event that would impact his chances of being accepted into it. *Id.* ¶ 83. Plaintiff qualifies for income-based repayment plans with the DOE. Based on Plaintiff's income of $134,000, DOE estimates that his monthly payments on the Income-Based Repayment Plan ("IBR Plan") and Saving on a Valuable Education ("SAVE") would be $928 and $834, respectively. *Id.* ¶ 87. The SAVE plan is currently subject to a nationwide injunction. *Id.*

Plaintiff has not enrolled in a DOE income-driven repayment plan, although he has considered doing so. *Id.* ¶ 88. He has also considered applying for the DOE's Public Service Loan Forgiveness program, but has taken no steps to do so. *Id.* ¶ 89. Plaintiff acknowledges that he could pay something towards his Federal Student Loan Debt if he was forced to, by cutting certain items out of his budget. *Id.* ¶ 90. However, he contends that he does not yet know what to cut, and that he has not been advised by the DOE, after submitting an attestation, interrogatories, and sitting for a deposition, what to cut from his budget. *Id.*

## THE SUMMARY JUDGMENT MOTIONS

### The DOE Motion

DOE contends that the *Brunner* Test governs the discharge of Plaintiff's Federal Student Loan Debt. *See* DOE Motion at 2. DOE argues that, pursuant to section 523(a)(8) of the Bankruptcy Code, a student loan may only be discharged if the debtor demonstrates that repayment of the loan will impose an undue hardship on the debtor and any dependents. *Id.* at 8. DOE argues that, pursuant to *Brunner,* a debtor who claims undue hardship must show, by a preponderance of the evidence,

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 8-9 (quoting *Brunner*, 831 F.2d at 396).

DOE asserts that it is entitled to summary judgment dismissing the Complaint because based on the facts, Plaintiff does not satisfy any prong of the *Brunner* Test, and those facts establish that there are no "extreme circumstances" that would warrant discharge of his Federal Student Loan Debt. *Id*. at 10 (citing *Williams v. N.Y. Higher Educ. Servs. Corp (In re Williams)*, 296 B.R. 298, 303 (S.D.N.Y. 2003), *aff'd* 84 F. App'x 158 (2d Cir. 2004)). First, DOE argues that Plaintiff is plainly able to maintain a "minimal" standard of living while repaying his Federal Student Loans since, as a result of his chapter 7 discharge and the repayment of his Private Student Loan, they are his only remaining debts. *Id*. at 11. Briefly, DOE contends that Plaintiff's salary as a psychiatric nurse practitioner, combined with manageable necessary expenses, allows him to maintain a minimal standard of living even with loan payments, particularly if he prioritizes loan repayment over discretionary spending and reduces retirement contributions. *Id.* at 11-17. Second, DOE

contends Plaintiff faces no exceptional or persistent circumstances that will prohibit him from repaying his loans over the Repayment Period. *Id.* at 18. DOE notes that Plaintiff has stable employment opportunities, substantial earning potential, and only minor health issues that do not affect his ability to work. *Id.* Third, DOE asserts that Plaintiff plainly has not made a good faith effort to repay his Federal Student Loans. *Id.* at 21. As support, it argues that Plaintiff: (i) commenced this adversary proceeding while he was still enrolled in the NYU nursing program, (ii) has made no loan payments, (iii) did not enroll in an income-driven repayment plan, and (iv) has prioritized paying off the Private Student Loan instead of the Federal Student Loans. *Id.* at 21-23. DOE also argues that the Post-Petition Student Loan Debt is not dischargeable under section 727(b) of the Bankruptcy Code as a matter of law. *Id.* at 23-24.

### Plaintiff's Motion

Plaintiff opposes the DOE Motion and cross-moves for summary judgment. Xiao Motion at 1. In support of his position, Plaintiff advances three arguments.

First, Plaintiff contends DOE has exhibited bias in prosecuting this adversary proceeding. *Id.* at 2-4. He complains that DOE characterized him as pursuing "a rewarding and lucrative career" and as someone who "intends to have the Government foot the bill for his education." *Id.* at 2-3. He contends that DOE declined to review exhibits to the Complaint, or the attestation sent March 30, 2024, and informed him on May 17, 2024, and again on June 28, 2024, that it would not make settlement offers. *Id.* at 3. He notes the DOE Motion, and Memorandum of Law in support of the motion are dated October 3, 2024, the same day the Joint Statement was finalized. *Id.* Plaintiff further asserts that as he incurred the Federal Student Loan Debt, he anticipated getting assistance in repaying the debt from the Nurse Corps Loan Repayment Program, which pays up to 85% of student loans for selected applicants. *Id.* at 3-4.

Second, Plaintiff complains that DOE failed to adhere to the Department of Justice's "Guidance for Department Attorneys Regarding Student Loan Bankruptcy Litigation" dated November 17, 2022 (the "DOJ Guidance"). *Id.* at 4-13. He asserts that DOE ran afoul of the DOJ Guidance for the following reasons: (i) DOE compared his gross income to federal poverty levels rather than allowable expenses under IRS collection financial standards (the "IRS Standards"); *id.* at 5-6; (ii) DOE excluded his 403(b) retirement contribution from allowable expenses and added the pre-tax contribution amount directly to after-tax income; *id.* at 6; (iii) DOE compiled a partial list of expenses totaling less than the Joint Statement's $6,325 monthly projected expenses without reconciliation; *id.* at 7; (iv) DOE failed to accept his explanations for expenses exceeding national and local standards, including $900 monthly for food costs; *id.* at 7-8; (v) DOE excluded $930 monthly for training programs and clinical supervision from other necessary expenses; *id.* at 8-9; (vi) DOE misrepresented $900 in work/professional/emergency expenses as $875 for "books, dues, and licenses" alone; *id.* at 9-10; and (vii) DOE relied on HUD fair market rent surveys covering broader areas rather than specific work locations. *Id.* at 11-12.

Third, Plaintiff asserts that he satisfies all three prongs of the *Brunner* Test. *Id.* at 13-18. He says he satisfies the first prong because he has demonstrated that he cannot maintain a "minimal" standard of living if forced to repay the Federal Student Loan Debt because his projected monthly expenses of $6,325 exceed his take-home pay of $5,893.64 by $432. *Id.* at 13-14. Next, Plaintiff argues that he meets the second prong because there are no facts in the record that demonstrate that his financial condition will improve in the future to the point at which he is able to repay his Federal Student Loans while maintaining a minimal standard of living. *Id.* at 14. He contends that given his health problems, under the best scenario, even if he is able to work and is employed, he does not expect to receive a raise at his current employer for the foreseeable future.

*Id.* He says that it is difficult to predict what his salary might be, if he changed employers. He speculates that the compensation level of psychiatric nurse practitioner positions is driven by market forces and maintains that in some cases salaries fell significantly from what they were last year. *Id*. at 14. He believes that there is very limited promotion opportunity for nurse practitioners as mid-level providers, as compared to psychiatrists. *Id*.

Finally, he argues that he satisfies the third prong, and that his good faith is manifest since: (i) he borrowed $79,256 less than the maximum he was eligible to borrow while he attended NYU, (ii) he completed a Grad PLUS credit counseling (the "Credit Counseling") in December 2023 in conjunction with applying for the last group of his student loans, by selecting income-based repayment plans and Public Service Loan Forgiveness options in the Credit Counseling, minimized projected initial payment amount, compared with his projected income and other expenses, and used the result of this Credit Counseling as the basis of the adversary complaint, and (iii) he has considered enrolling in a DOE income-driven repayment plan, and considered applying for DOE's Public Service Loan Forgiveness program. *Id*. at 15-16.

Plaintiff also asserts that the financial information in the Petition, his attestation and answers to DEO's interrogation show that he has "essentially zero" assets beyond potentially a couple months of living expenses. *Id*. at 17. He contends that he filed the Chapter 7 Case after suffering financial loses as a victim of a financial scam. *Id.* at 6. He contends he has just begun rebuilding his retirement fund after starting employment as a psychiatric nurse practitioner in August 2024 and maintains a "significant negative net worth situation" that provides no financial buffer for unforeseen needs. *Id.*

Plaintiff argues that all the Federal Student Loan Debt is dischargeable under section 727(b) of the Bankruptcy Code because DOE disbursed all the loans to him before he filed the

13

Complaint, and the DOE mandated credit counseling that established the basis for his Complaint, requires review of total projected loan balance and payment plans. *Id.* at 17-18. Plaintiff contends that the loan balance and payment obligations creating undue hardship are "inseparable pre and post Chapter 7 petition," and that separating them would not relieve his hardship because a 50% reduction in principal does not result in a 50% reduction in monthly payments under income-driven repayment plans. *Id.* at 18. Alternatively, he requests discharge of "a substantial portion of the loan balance resulting in a nominal amount of monthly loan payment." *Id.*

**The DOE Reply**

DOE maintains that Plaintiff has not satisfied any prong of the *Brunner* Test and rejects his claims that it committed technical errors in its analysis of Plaintiff's case. It contends that its evaluation of Plaintiff's income and expenses adheres to the *Brunner* standard, and Plaintiff's reliance on the DOJ Guidance is misplaced, as internal policies do not supplant binding legal precedent. DOE Reply at 1. DOE points out that in any event, applying DOJ Guidance does not support Plaintiff's case. *Id.* at 4-5. DOE argues that Plaintiff's income allows him to repay his student loans while maintaining for a minimal standard of living, his financial situation lacks the exceptional or persistent circumstances required to justify discharge of the student loans, and his failure to make any payments or enroll in an income-driven repayment plan demonstrates a lack of good faith. *Id.* at 1-2. DOE reiterates that Plaintiff's Post-Petition Student Loan Debt is categorically non-dischargeable under the Bankruptcy Code. *Id.* at 8. For these reasons, DOE asserts the Court should grant the DOE Motion and deny the Xiao Motion.

**Plaintiff's Reply**

Plaintiff maintains that DOE misapplied the law and contests the validity of factual determinations based on the parties' Joint Statement. Xiao Reply at 2. Specifically, Plaintiff argues

that DOE improperly challenged the reasonableness and necessity of his documented expenses in their motion papers, such as his projected expenses for retirement contributions, food, housing, miscellaneous support for his adult son, and continuing education. According to Plaintiff, his expense categories were "clearly delineated," "scrutinized during Deposition," and "certainly agreed to without any confusion in the Joint Statement," and that DOE's challenge to them constitute an improper attempt to invalidate the extensive discovery process and the clarity of the Joint Statement. *Id.* at 4-5.

Plaintiff states his projected monthly expenses of $6,325 exceed his take-home pay of $5,893 by $432. *Id.* at 2-3. He addresses DOE's objection to his retirement contribution, asserting that DOE incorrectly claimed his pre-contribution take-home pay would be $8,346 per month without accounting for income tax on that amount. *Id.* at 3. Plaintiff contends that even with zero retirement contribution, he would have a $518 deficit post-July 2025 due to lost tax benefits. *Id.* at 6.

Plaintiff argues that in calculating his expenses, DOE misapplied the DOJ Guidance by considering only national and local standards and other necessary expenses, while omitting "reasonable expenses not incurred." *Id.* at 3-4. He provides specific examples: (i) for housing, DOE allowed $905 based on current arrangement but he budgets $2,700 post-July 2025, which remains below the allowance of $3,724 for New York City; *id.* ; (ii) for food expenses, DOE claimed lack of explanation despite extensive discovery and deposition testimony; *id.* at 4; (iii) for miscellaneous expenses of $900 including support for his son with bipolar disorder and professional expenses, DOE claimed lack of justification despite Joint Statement agreement; *id.* (citing Joint Statement ¶ 76); and (iv) for $925 monthly continuing education and

supervision expenses, DOE ignored his explanations regarding inadequate supervision for child and adolescent care, *id.* at 5.

Plaintiff calculates that income-based loan payments of $928 would increase his deficit to $1,360 initially (rising to $1,952 later), while the Standard Monthly Payment of $1,785.60 would create a deficit of at least $2,218. *Id.* at 5-6. He explains he has not enrolled in income-based loan repayment plan due to administrative forbearance through February 2025 and uncertainty about program availability. *Id.* at 7. He states he selected such options during credit counseling and expressed willingness to negotiate partial repayment. *Id.*

Finally, Plaintiff maintains that discharging only the Prepetition Student Loan Debt (approximately 50% of the balance of his Federal Student Loan Debt) would not reduce his monthly payments proportionally under income-driven repayment structures. *Id.* at 8-9. He requests either full discharge of his Federal Student Loan Debt or discharge of a substantial portion of that indebtedness to achieve nominal monthly payments. *Id.* at 9.

## **LEGAL PRINCIPLES**

### **Summary Judgment Standard**

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. It is made applicable herein by Bankruptcy Rule 7056. *See* Fed. R. Bankr. P. 7056. A court can grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Therefore, on summary judgment, a court considers whether there is a genuine issue to be tried but does not weigh the evidence itself. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether there is a genuine issue to be tried, a court must resolve any ambiguities and draw any reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *accord Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). In short, the Court views the evidence in the light most favorable to the non-moving party. *Anderson v. Liberty Lobby*, 477 U.S. at 255.

The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995); *accord Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) ("Summary judgment is appropriate only if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." (internal citation omitted)).

If the moving party carries that burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). The non-moving party can only establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). "After the non-moving party to the summary judgment motion has been afforded a sufficient time for discovery, summary judgment must be entered against it where it fails to make a showing sufficient to establish the existence of an element essential to its case and on which it has the burden of proof at trial." *In re Worldcom, Inc.*, 374 B.R. 94, 105 (Bankr. S.D.N.Y. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

Where, as here, both parties seek summary judgment, each party's motion "must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). Each party has the burden of presenting evidence that would allow the court to "direct a verdict in its favor." *McDonnell v. First Unum Life Ins. Co.*, No. 10 CV 8140, 2013 WL 3975941, at *13 (S.D.N.Y. Aug. 5, 2013) (quoting *Barhold v. Rodriguez*, 863 F.2d 233, 236 (2d

Cir. 1988)). If neither party can do so, "a court need not enter judgment for either party." *Roberts v. Genting New York LLC*, 68 F.4th 81, 88 (2d Cir. 2023) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d at 121); *see also Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968) ("Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified . . . .").

**Standard for Student Loan Discharge**

Section 523(a)(8) of the Bankruptcy Code governs the dischargeability of student loan debts. It provides that student loan indebtedness within its scope is not dischargeable in bankruptcy "unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents . . . ." 11 U.S.C. § 523(a)(8). "The purpose of restricting dischargeability of certain educational benefits and loans under section 523(a)(8) is to avoid abuse by students who may attempt to discharge such loans upon graduation, and to prevent harm to the governmental and non-profit entities that provide educational loans to students." *Davis v. Fin. Comm. (In re Davis)*, 316 B.R. 610, 613 (Bankr. S.D.N.Y. 2004) (citation omitted).

Section 523(a)(8) is "self-executing." *Tennessee Student Assistance Corp. v. Hood*, 541 U.S. 440, 450 (2004). "Unless the debtor affirmatively secures a hardship determination, the discharge order will not include a student loan debt." *Id.* Therefore, a debtor seeking to discharge student loan debts must initiate an adversary proceeding to obtain a hardship determination under section 523(a)(8). *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 269 (2010). The Bankruptcy Code does not define "undue hardship," leaving it to the courts to interpret and apply this standard. *Lozado v. Educ. Credit Mgmt Corp. (In re Lozada)*, 594 B.R. 212, 222 (Bankr. S.D.N.Y. 2018) (referencing the *Brunner* Test).

"A debtor carries a heavy burden when she seeks to establish an undue hardship under section 523(a)(8)." *Williams v. N.Y. State Higher Educ. Serv. Corp. (In re Williams)*, 296 B.R. 298, 302 (S.D.N.Y. 2003), *aff'd* 84 F. App'x 158 (2d Cir. 2004) (summary order). In assessing whether a debtor can meet that standard, the Second Circuit framed the three-prong *Brunner* Test. Under that test, the debtor must prove that: (1) the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay his student loans; (2) additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of these loans; and (3) the debtor has made good faith efforts to repay the loans. *Brunner*, 831 F.2d at 396, *cited with approval in Tingling v. Educ. Credit Mgmt. Corp. (In re Tingling)*, 990 F.3d 304, 306 (2d Cir. 2021) (examining whether a debtor established "undue hardship" to discharge her student loan debts under the *Brunner* Test).

Plaintiff must satisfy all three prongs of the *Brunner* Test to obtain a discharge of his Federal Student Loan Debt under section 523(a)(8). *Gesinde v. United States Dep't of Educ. (In re Gesinde)*, No. 18-10320, Adv. No. 18-01434, 2019 WL 5090080, at *7 (Bankr. S.D.N.Y. Oct. 10, 2019) ("[A] Debtor needs to satisfy each of the three elements of the *Brunner* [T]est."). Accordingly, "[i]f one of the requirements of the *Brunner* [T]est is not met, the bankruptcy court's inquiry must end there, with a finding of no dischargeability." *Hixson v. United States Dep't of Educ. (In re Hixson)*, 450 B.R. 9, 22 (Bankr. S.D.N.Y. 2011) (quoting *Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish),* 72 F.3d 298, 306 (3d Cir.1995)); *see also Bacote v. Educ. Credit Mgmt. Corp. (In re Bacote)*, No. 02-11553, Adv. No. 05-03209, 2006 WL 3732993, at *8 (Bank. S.D.N.Y. Dec. 15, 2006).

The Court considers the application of the *Brunner* Test in the context of the cross-motions for summary judgment. To establish undue hardship, Plaintiff must prove all three prongs of that

19

test by a preponderance of the evidence. *Benjumen v. AES/Charter Bank (In re Benjumen)*, 408 B.R. 9, 15 (Bankr. E.D.N.Y. 2009) (citation omitted). Summary judgment in favor of the Plaintiff is appropriate only if Plaintiff can establish that there are no genuine disputes of material facts concerning whether payment of the Federal Student Loan Debt imposes on undue hardship on him, and that he is "entitle[d] to judgment as a matter of law." *Hebda v. Davis Selected Advisers, L.P.* (*In re Davis New York Venture Fund Fee Litig.*), 805 F. App'x 79, 80 (2d Cir. 2020) (summary order) (quoting *FIH, LLC v. Found. Cap. Partners LLC*, 920 F.3d 134, 140 (2d Cir. 2019)). Plaintiff must establish that the law favors the judgment sought. *Gonzalez v. Rutherford Corp.*, 881 F. Supp. 829, 834 (E.D.N.Y. 1995) ("It is well-established that summary judgment is appropriate only when there are no genuine issues of material fact requiring resolution at trial, and when the law supports the moving party." (citations omitted)); *Linares v. City of White Plains*, 773 F. Supp. 559, 560 (S.D.N.Y. 1991) (explaining that summary judgment is appropriate when "the law so favors the moving party that entry of judgment in favor of the movant dismissing the complaint is proper"). In contrast, in the context of DOE's motion for summary judgement, where "the nonmoving party [Plaintiff] will bear the ultimate burden of proof at trial, the moving party's [DOE] burden is satisfied if it can point to an absence of evidence to support an essential element of the nonmoving party's [Plaintiff] claim." *Pavel v. Plymouth Mgt. Group, Inc.*, 198 F. App'x 38, 40 (2d Cir. 2006) (summary order) (citing *Celotex,* 477 U.S. at 322-323). Accordingly, to prevail on its motion, "[DOE] need only show an absence of evidence to support the [Plaintiff's] claim." *Id.*

## **ANALYSIS**

Where, as here, the facts are not in dispute and the issues contested in the summary judgment motions are legal issues, the court may decide those issues and rule accordingly on the

summary judgment motions. *In re MacMenamin's Grill Ltd.*, 450 B.R. 414, 417 (Bankr. S.D.N.Y. 2011) ("Of course, where the parties do not dispute the material facts, disagreeing instead on the outcome based on the applicable law, the matter is appropriate for summary judgment.") (citing *Adirondack Transit Lines, Inc. v. United Transp. Union,* 305 F.3d 82, 84 (2d Cir.2002)). The matters at issue in the cross-motions are ripe for summary judgment. As a preliminary matter, the Court delineates the parameters of Plaintiff's potentially dischargeable Federal Student Loan Debt. Plaintiff seeks discharge of Federal Student Loans totaling $151,030, including both his Prepetition Federal Student Loan Debt ($76,030) and his Post-Petition Federal Student Loan Debt ($75,000). Joint Statement ¶¶ 31-33. Plaintiff argues that his Prepetition and Post-Petition Federal Student Loans are "inseparable." Xiao Motion at 17-18. There is no merit to that contention.

Section 727(b) of the Bankruptcy Code provides that a discharge in bankruptcy extends only to debts "that arose before the date of the order for relief." 11 U.S.C. § 727(b). The Supreme Court has made clear that obligations arising post-petition survive bankruptcy and remain enforceable. *Law v. Siegel*, 571 U.S. 415, 427 (2014); *accord In re Cole*, 202 B.R. 356, 358 n.4 (Bankr. S.D.N.Y. 1996) ("The discharge under 11 U.S.C. § 727(b) does not encompass postpetition debts . . .").

As of the Petition Date, Plaintiff had incurred $76,030 in Federal Student Loan Debt. Joint Statement ¶ 31. The Post-Petition Federal Student Loans constitute new debts that fall outside the scope of section 727's discharge provisions in this Chapter 7 Case. They are non-dischargeable in the Chapter 7 Case, regardless of any claimed hardship. *See Clarke v. Paige (In re Clarke)*, 266 B.R. 301, 309 (Bankr. E.D. Pa. 2001) ("Nothing in § 523(a)(8) excepts post-petition education debt, even where it may place an undue hardship upon the debtor.").

That is the case even when pre and post-petition student loans are consolidated: the resulting new obligations are post-petition debts that cannot be discharged. *See Educ. Credit Mgmt. Corp. v McBurney (In re McBurney)*, 357 B.R. 536, 538-39 (9th Cir. B.A.P. 2006) (adopting the view that post-petition consolidation student loan is a new, distinct loan, extinguishing prepetition loan debts); *accord Grubin v. Sallie Mae Servicing Corp., (In re Grubin)*, 476 B.R. 699, 709 (Bankr. E.D.N.Y. 2012) ("It is settled that, where a debtor incurs student loan debt pre-petition, but then enters into a post-petition agreement to consolidate that debt, the consolidation agreement extinguishes the pre-petition debt and gives rise to new, post-petition debt."). The principle is straightforward: a discharge under section 727 can only affect debts that existed as of the commencement of the bankruptcy case. It does not reach forward to discharge obligations that the debtor voluntarily undertook after seeking bankruptcy protection.

Therefore, Plaintiff's contention that his Prepetition and Post-Petition Federal Student Loans should be treated as "inseparable" for discharge purposes fails as a matter of law. The Post-Petition Federal Student Loan Debt is not eligible for discharge, regardless of any claimed hardship. The Court's undue hardship analysis under section 523(a)(8) applies only to Plaintiff's Prepetition Student Federal Loan Debt.[19]

---

[19] Plaintiff asserts the Court "may wish to consider a discharge of a substantial portion of the loan balance resulting in a nominal amount of monthly loan payment." Xiao Reply at 9. The Court declines this invitation for multiple reasons. First, as established above, the Post-Petition Student Loan Debt is categorically non-dischargeable under section 727(b) of the Bankruptcy Code. Second, while some courts have recognized authority to grant partial discharge of student loan debt, *Clavell v. United States Dep't of Educ. (In re Clavell)*, 611 B.R. 504, 531-32 (Bankr. S.D.N.Y. 2020), such relief requires that the debtor satisfy all prongs of the *Brunner* Test as to the portion of debt proposed for discharge. The *Clavell* court's discussion of partial discharge authority pertained only to prepetition obligations subject to the bankruptcy court's jurisdiction, not post-petition debts that fall outside the scope of section 727(b)'s discharge provisions. *See id.* Third, even limiting consideration to the Prepetition Federal Student Loan Debt alone, as explained below, Plaintiff has failed to satisfy any prong of the *Brunner* Test rendering partial discharge analysis unnecessary. Plaintiff has not demonstrated which specific portion of his Prepetition Federal Student Loan Debt would satisfy any prongs of the *Brunner* Test, nor has he shown how partial discharge of any amount would alleviate the claimed undue hardship given his demonstrated capacity to service educational debt through reasonable expense reductions.

**Application Of The DOJ Guidance**

Plaintiff misplaces his reliance on the DOJ Guidance for several reasons. First, the Guidance itself explicitly disclaims any binding effect, stating it "is not intended to and does not create any rights, substantive or procedural, enforceable at law by any party in any matter." DOJ Guidance at 16 n.22. This disclaimer conforms to established administrative law principles that internal agency guidance documents cannot create enforceable rights against the government absent explicit statutory authorization. It does not bind this Court or establish a legal standard for discharge under section 523(a)(8). *See In re Jones*, No. 14-10143, 2025 WL 432843, at *4 (Bankr. S.D.N.Y. Feb. 6, 2025) ("[T]he DOJ Guidelines are not binding on bankruptcy courts . . ."); *see also Hayward v. United States Dep't of Educ. (In re Hayward)*, 655 B.R. 458, 459 n.1 (Bankr. W.D. Tex. 2023) ("[T]he Department of Justice's internal guidelines are not binding on this Court.").

Second, this Court is bound by Second Circuit precedent applying the *Brunner* Test. The law is clear: circuit court decisions bind district and bankruptcy courts within the circuit, while internal agency guidance carries no binding force. *See Official Comm. of Unsecured Creditors of Lois/USA, Inc. v. Conseco Fin. Serv. Corp. (In re Lois/USA, Inc.)*, 264 B.R. 69, 102 (Bankr. S.D.N.Y. 2001) ("Needless to say, decisions of the Second Circuit are binding on this Court"). DOJ Guidance could not supersede binding circuit precedent.

Third, the DOJ Guidance itself acknowledges that "the most common framework for assessing undue hardship is the so-called *Brunner* [T]est" and provides that its application must remain "consistent with . . . existing case law." DOJ Guidance at 3. The Guidance does not purport to establish alternative legal standards, rather, it provides internal prosecutorial guidance for applying existing legal precedents. Plaintiff's attempt to transform such guidance into binding

legal standards misconceives the nature and function of those documents. The DOJ Guidance expressly aligns with existing case law, including *Brunner*, and focuses on streamlining fact-gathering through an attestation form to assess present ability to pay, future persistence, and good faith. *See id.* at 1-2. It applies primarily to first prong of the *Brunner* Test, as it focuses on an evaluation of current income and expenses, using IRS Standards as a benchmark for allowable expenses. *Id.* at 5-8. DOE's deviation from the DOJ Guidance would not compel discharge, as the Court independently determines undue hardship based on the evidentiary record. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 278 (2010) ("to comply with § 523(a)(8)'s directive, the bankruptcy court must make an independent determination of undue hardship before a plan is confirmed, even if the creditor fails to object or appear in the adversary proceeding").

Fourth, the DOJ Guidance's analytical framework does not support Plaintiff's position on the merits. It specifically states that "gross income includes income from employment of the debtor and other household members, as well as unemployment benefits, Social Security benefits and other income sources," thereby including the retirement contributions Plaintiff seeks to exempt from income calculations. DOJ Guidance at 8. It further instructs that "the Department attorney should compare the debtor's expenses to the debtor's household gross income" to determine available funds for loan payments. *Id.*

Under this methodology, DOE's analysis comparing Plaintiff's gross income exceeding $8,000 monthly (including retirement contributions) with calculated allowable expenses of $2,096 for basic living categories, demonstrates substantial discretionary income available for student loan payments. *See* Joint Statement ¶¶ 42-48. This calculation aligns with the Court's independent analysis under the *Brunner* Test and would yield the same result. The DOJ Guidance's emphasis on IRS Standards supports rather than undermines DOE's position, as these standards establish

maximum allowable amounts for basic necessities rather than minimum entitlements for debtors seeking discharge relief. DOJ Guidance at 6.

The Court turns it attention to the *Brunner* Test.

## <u>Application Of The *Brunner* Test</u>

### *The First Prong*

The first prong of the *Brunner* Test requires examination of whether Plaintiff can maintain a minimal standard of living for himself and any dependents if forced to repay his student loans. *Brunner*, 831 F.2d at 396. "[A] finding of undue hardship will not be based simply on the debtor's difficulty in making payments." *In re Williams*, 296 B.R. at 302. Accordingly, "[t]his prong 'requires more than a showing of tight finances,' . . . and is not met 'merely because repayment of the borrowed funds would require some major personal and financial sacrifices.'" *In re Hixson*, 450 B.R. at 20 (quoting *In re Faish,* 72 F.3d 298 at 306).

Rather, Plaintiff must "show inability, at [his] current level of income and expenses, to maintain a 'minimal' standard of living . . . ." *Nash v. Conn. Student Loan Found.* (*In re Nash*), 446 F.3d 188, 190 (1st Cir. 2006); *see also French v. NCO Fin. Sys. (In re French)*, No. 04-03060, 2006 WL 2583646, at *10-11 (Bankr. S.D.N.Y. Aug. 31, 2006) ("The first *Brunner* prong examines a debtor's *short*-term ability to make student loan payments, taking into account the debtor's *current* income and expenses." (emphasis added)). In *Clavell v. United States Department of Education (In re Clavell)*, 611 B.R. 504 (Bankr. S.D.N.Y. 2020) (Wiles, J), the Court, provides helpful guidance in assessing what constitutes a "minimal standard of living." It found that a minimal standard of living does not require debtors to forego "necessary and reasonable expenses, such as healthcare expenses, food, and a modest amount of recreation and entertainment as incident to modern life." *Id*. at 517. The Court recognized that "[a]t bottom, the Bankruptcy Code requires

bankruptcy courts to decide how much personal sacrifice society expects from debtors who have unpaid student loans." *Id.* This assessment requires balancing the debtor's reasonable needs against their obligation to repay student loans. In making that assessment, the Court may consider known future changes in a debtor's finances. *In re Hixson*, 450 B.R. at 21 (noting "the appropriate place to take into consideration a known future change in the debtor's finances is the first prong of the *Brunner* [T]est.").

Plaintiff began working as a psychiatric nurse practitioner at Flushing Hospital on August 12, 2024, with an annual salary of $134,000. Currently, Plaintiff is paying $830 per month in rent. His other monthly expenses include $900 for food, $300 for household supplies and personal hygiene, $200 for transportation, $250 for a family cellphone plan, $100 for dietary supplements, and $50 for health insurance. Joint Statement ¶¶ 51-56.

Plaintiff projects monthly expenses totaling $6,325 following his anticipated July 2025 relocation, when his current housing arrangement terminates. *Id.* ¶¶ 50, 62. He categorizes these expenses into four primary allocations: (i) retirement contributions of $2,542, representing the maximum allowable 403(b) contribution; (ii) professional development and continuing education totaling $1,825, comprising $925 for training programs and $900 for work-related and emergency expenses including family support; (iii) housing costs of $2,700, reflecting his intended Manhattan relocation from his current $830 monthly rent; and (iv) basic living expenses of $1,258, covering food ($900), household supplies ($300), transportation ($200), medical costs ($250), telecommunications ($75), professional liability insurance ($50), entertainment ($100), and other necessities. *Id.* ¶¶ 46, 68-77. This results in a monthly shortfall of $432 before any student loan payments. *Id.* ¶ 82.

Plaintiff's Standard Monthly Loan Payment is $1,785. Guillon Decl. ¶ 23. His projected monthly payments under the IBR Plan are $928. Joint Statement ¶ 87. Plaintiff claims his future financial situation prevents him from maintaining a minimal standard of living while also making student loan payments.

Plaintiff maintains this projected budget exceeds his monthly take-home pay of $5,893.64 by $432, rendering him unable to service any student loan obligations. *Id*. ¶ 82; *see also* Xiao Motion at 10-12. The Court recognizes Plaintiff attributes much of his increased expenses to the potential long-term benefits of Plaintiff's professional ambitions, including his desire to serve underserved communities. *See* Joint Statement ¶ 63. However, these aspirations must be balanced against his legal obligations to repay his student loans. As Plaintiff admits, the reduction of his discretionary income is a result of his "desire and preferences." Xiao Motion at 12. The Court examines each category to determine whether these allocations represent necessities for maintaining a minimal standard of living or discretionary choices that must yield to student loan obligations. Plaintiff failed to show his "desire and preferences" are entitled to be prioritized over his loan repayment obligations.

<u>Retirement Contribution</u>

Plaintiff intends to contribute the maximum allowable 403(b) retirement plan payment in the amount of $2,542 per month. Joint Statement ¶ 46. This represents the maximum allowable contribution for an individual over age 50 under Internal Revenue Code provisions. *Id.* It constitutes approximately 43% of his after-tax income and 30% of his gross income. Plaintiff argues this contribution should be treated as an allowable pre-tax deduction under the IRS Standards, emphasizing his status as a nonprofit employee who suffered "total financial loss as result of the financial scam that led to the bankruptcy filing." Xiao Motion at 6. He contends he

needs to "catch up" on retirement savings given his advanced age and limited working years remaining until the maximum social security retirement age of 70. *Id.*

Modest retirement contributions can be considered reasonable expenses. *See In re Clavell*, 611 B.R. at 521 ("I note that the DOE agrees that modest expenses for life insurance and disability insurance are proper and reasonable, because the contingencies and uncertainties of life simply need to be addressed. I conclude that modest retirement contributions of the kind at issue here should be regarded in the same light."). Still, courts have found that such contributions are "not required to provide for Debtor's basic necessities or to maintain a minimal standard of living while paying his student loan debt." *Richardson v. Educ. Credit Mgmt. Corp (In re Richardson)*, No. 16-11197, 2018 WL 4719083, at *5 (Bankr. S.D. Ga. Sept. 28, 2018) (collecting cases). Courts have found even the "desired" retirement contribution of $100 is not necessary for the Debtors to maintain a minimal standard of living. *Johnson v. Dep't of Educ. (In re Johnson)*, 543 B.R. 601, 608 (Bankr. W.D. Mo. 2015); *see also ECMC v. Acosta-Conniff*, 583 B.R. 275, 280 (M.D. Ala. 2018) (recognizing if the debtor "squeeze a couple of hundred more out of her budget" by at least reducing her voluntary retirement contribution, it may be that she could reasonably make a monthly income contingent repayment plan for student loans). "Congress, through its demanding standard, has chosen to give priority to the repayment of student loan debts." *Educ. Credit Mgmt. Corp. v. Young*, 376 B.R. 795, 800 (E.D. Tex. 2007). This means that voluntary financial planning activities, however prudent under normal circumstances, cannot take precedence over existing educational debt obligations when debtors seek discharge relief.

Nor has Plaintiff shown he is incapable of reducing his retirement plan contribution[20] or other expenses.[21] A reduction of either may allow him to pay his Standard Monthly Payment. In other words, Plaintiff fails to show his budgets are rigid to a point where he can never have any monthly surplus to cover his student loan repayments. *In re Lozada*, 594 B.R. at 225 (holding sizable monthly surplus shows debtor failed to minimize their expenses as required in order to satisfy the first prong under the *Brunner* Test).

Plaintiff's calculations demonstrate this is more about personal financial planning preferences rather than basic necessities. His argument about "catching up" due to prior financial losses essentially asks the Court to prioritize his future financial security over existing obligations to repay educational loans that enabled his current earning capacity. He acknowledges that reducing his retirement contribution by just $500 monthly would yield $482 available for loan payments, factoring in tax consequences. Xiao Decl. at 3, Ex. 1. This amount, when combined with other potential expense reductions, would approach the $928 IBR Plan payment available under income-driven repayment programs. Joint Statement ¶ 87. This shows that Plaintiff, while still maintaining a substantial contribution to his retirement, could reasonably afford that payment.

The Court finds that Plaintiff's maximum monthly retirement contributions of $2,542 substantially exceed what is necessary to maintain a minimal standard of living. While modest retirement planning may be reasonable, Plaintiff's allocation of nearly half his take-home income

---

[20] Joint Statement ¶¶ 42, 45, 46. Plaintiff complains DOE committed "material technical error" by adding his retirement contribution back into his after-tax income and resulted in an inflated "take-home pay." Xiao Motion at 6. According to Plaintiff, his monthly income after tax is $7,158. Debtor's Complaint at 19. Accordingly, if Plaintiff stops making the retirement contribution, he will have an increase of $1,265 in his income. *See* Joint Statement ¶ 48.

[21] Plaintiff's allocated expenses are not fixed or definitive, as shown by Plaintiff's admission that his proposed budget includes "taking annual vacation to be re-charged for his work," and that he stopped his "gym membership." Xiao Motion at 10-11.

to retirement savings while claiming inability to service educational debt shows prioritization of personal finance rather than basic necessity.

<u>Professional Development and Continuing Education Expenses</u>

Plaintiff budgets $925 monthly for continuing education programs and professional development, plus an additional $900 for work and professional expenses combined with emergency funds. Joint Statement ¶¶ 76-77. This combined allocation exceeds Plaintiff's Standard Monthly Payment of $1,785 and each approaches his projected income-driven payment amounts. Plaintiff contends these expenses are necessary for providing "ethical and adequate care to the child and adolescent population," arguing that his hospital's collaborative agreement is "inadequate in providing the collaboration and supervision in practice." Xiao Motion at 8.

The Court distinguishes between expenses required for maintaining current employment and those undertaken for professional enhancement. The record shows that Plaintiff's position at Flushing Hospital requires only a collaborative agreement with a psychiatrist for the first two years of practice, with no requirement for paid clinical supervision. Joint Statement ¶ 79. While Plaintiff may believe additional training would improve his practice, the *Brunner* Test does not accommodate discretionary professional development expenses.

The case of *In re Lozada* is instructive. There, the court noted that the debtor's charitable contribution of 10% of his income "while commendable, cannot per se be exempted from contractual obligations" of repaying the student loan debt. *Id.* at 223. The court stated that "religious and significant charitable donations are per se not proper expenses in determining whether discharging student loan debt would result in undue hardship." *Id.* at 223 (citing *In re Fulbright*, 319 B.R. 650, 660 (Bankr. D. Mont. 2005)).

Similarly, here, Plaintiff's dedication to professional development represents a voluntary allocation of resources that prioritizes career advancement over loan repayment. The $1,825 monthly allocation to these discretionary expenses—an amount that exceeds Plaintiff's standard monthly loan payment of $1,785—demonstrates resources available for loan repayment that Plaintiff chooses to direct elsewhere. And under the *Brunner* Test, Plaintiff's desire for supervision and training beyond licensing requirements shows career advancement goals that constitute discretionary expenses that must yield to student loan obligations. *See In re Lozada*, 594 B.R. at 224 (noting reality that additional expenses are paid by "someone else's money" when debtors seek discharge).

<u>Emergency Fund and Family Support</u>

Plaintiff allocates $900 monthly for a combination of work expenses and emergency funds, which includes periodic support for his adult son diagnosed with bipolar disorder. Joint Statement ¶ 76. Plaintiff provided the Court with "detailed New York State children's psychiatric hospital evaluation and management reports" documenting his son's condition, noting his son "lives, loves and works independently, yet falls back on the Plaintiff for support when illness strikes." Xiao Motion at 10.

The Court recognizes that support for family members with documented medical conditions may constitute a reasonable expense under appropriate circumstances. However, the *Brunner* Test requires focus on the debtor's own minimal living standards rather than discretionary support for independent adult children. Plaintiff's obligation to repay educational loans that enabled his current earning capacity must take priority over voluntary family support that exceeds basic necessities. Plaintiff characterizes this support as averaging $750 monthly over the six-year period from June 2018 to June 2024. Joint Statement ¶ 59. This support is bundled with other

discretionary expenses including "annual vacation to be re-charged for his work" and general emergency funds. Xiao Motion at 10.

Given the sporadic nature of the support here, combined with its inclusion within a broader discretionary category that includes vacation expenses, Plaintiff has failed to demonstrate that the $900 allocation is necessary for him to maintain a minimal standard of living. While some emergency reserve may be reasonable, and while occasional family support for documented medical needs may be justified, the Court finds allocation of $900 monthly to this combined category exceeds what is necessary for minimal living standards.

<u>Housing and Medical Expenses</u>

Plaintiff currently pays $830 monthly in rent but projects relocating to Manhattan in July 2025 at a cost of $2,500 monthly plus $200 in utilities, totaling $2,700. Joint Statement ¶¶ 51, 62. Plaintiff justifies this increase by citing preferences for Manhattan including "proximity to areas where he interned, his psychoanalytic training institute, nursing school community, better access to healthy food and quieter environment." Xiao Motion at 12.

Courts recognize that debtors need "shelter, shelter that must be furnished, maintained, kept clean, and free of pests," but reject housing choices based on lifestyle preferences rather than necessity. *In re Clavell*, 611 B.R. at 517 (quoting *Ivory v. U.S. Dep't of Educ. (In re Ivory)*, 269 B.R. 890, 899 (Bankr. N.D. Ala. 2001)). In *Clavell*, the Court approved the debtor's housing arrangement because it represented "a successful effort to economize"—the debtor lived with his grandfather and paid far below market rent. *Id.* at 522-23. The Court specifically noted that total housing expenses were "far lower than the average of such costs" in the area and "significantly below the IRS [Standards] figure." *Id.* at 522. The Court's approval rested on demonstration of expense minimization rather than lifestyle preferences.

Plaintiff contends that DOE's reliance on HUD Fair Market Rent surveys is misleading because the survey covers the broader New York metropolitan area, including Putnam and Rockland counties—areas where Plaintiff has little intention of residing. Plaintiff argues that DOE "ran to the bottom" by using this geographically expansive survey to suggest artificially low housing benchmarks, when the reality is that comparable housing within his intended geographic constraints (Lower Manhattan, where he requires proximity to his work areas, training institute, and patient populations) does not meaningfully differ in cost from his projected $2,500 studio rent. Xiao Motion at 11-12. He criticizes DOE for suggesting impractical alternatives like living outside New York City or with a roommate. *Id.* His choice of Manhattan over these alternatives is based on his preference rather than necessity. *See* Joint Statement ¶¶ 63, 67.

In *In re Lozada*, the debtor relocated from the Bronx to Stamford, Connecticut, increasing rent from $867 to $2,500 monthly, and despite the debtor's argument that the move was necessary for his wife's medical condition, the court found "to suggest that there were no suitable homes available at a lower rent strains credulity." 594 B.R. at 225. The court emphasized the debtor's obligation to minimize expenses when seeking discharge of student loan obligations. Similarly, in *In re Clavell*, the court approved housing expenses only because they were "far lower than the average of such costs" in the area and "significantly below the IRS [Standards] figure." 611 B.R. at 522-23.

Here, Plaintiff's stated justifications—proximity to professional networks, psychoanalytic training institute, access to preferred food options, and environmental preferences—shows lifestyle choices rather than necessities for maintaining minimal living standards. While these factors might enhance Plaintiff's quality of life and professional development, they cannot justify doubled housing expenses when claiming inability to repay educational debt. The comparison with

*Lozada* is apt: both debtors sought to justify increased housing costs based on perceived benefits, but courts require expense minimization over personal preferences. The voluntary assumption of housing costs based entirely on Plaintiff's preference while claiming financial hardship undermines any claim of Plaintiff's claimed hardship.

The combined total of discretionary expenses—$2,542 for maximum retirement contributions, $1,805 for professional development, $900 for emergency funds and family support (partially), and increase of $1,670 of monthly rent—totals $6,917 monthly. This amount represents more than four times Plaintiff's Standard Monthly Payment and more than eight times his projected income-driven payment amounts. To be clear, the Court is not asking Plaintiff to "live at or below the poverty line." *In re Lozada*, 594 B.R. at 222. The Court concludes that Plaintiff has failed to demonstrate inability to maintain a minimal standard of living while repaying his student loans. His current and projected expenses show personal choices about priorities rather than basic necessities. Reasonable reductions in any of these four discretionary spending would enable Plaintiff to service his educational debt while maintaining adequate living standards.

Plaintiff's Recent Employment Termination

In his Reply to the DOE Motion, Plaintiff advised that on October 22, 2024, his employment at Flushing Hospital was terminated, "primarily due to Plaintiff's concern of lack of clinical supervision and certain other quality issues at Flushing Hospital." Xiao Reply at 5. He states that he has interviewed for positions offering marginally higher compensation but has not yet secured employment, and that he began psychoanalytic training in October 2024 but cannot afford clinical supervision. *Id.*

During the hearing, Plaintiff represented that this disclosure was not an attempt to amend or dispute the undisputed facts in the Joint Statement, and further stated that he is unable to collect

unemployment benefits, resulting in current income of zero. Unemployment may be a factor in determining whether a debtor can demonstrate that she is unable to maintain minimal living standards, while repaying her student loan debt. *See, e.g., Raimondo v. N.Y. State Higher Educ. Servs. Corp. (In re Raimondo)*, 183 B.R. 677, 679 (Bankr. W.D.N.Y. 1995) ("Being unemployed, [debtor] lacks sufficient income to both repay his student loans and maintain a minimal standard of living for himself, his wife, and his infant son."). However, that is not the case here. Plaintiff was gainfully employed in his chosen occupation and his employment was terminated based upon his subjective concerns about workplace supervision standards. Plaintiff is a CPA with an MBA and a Master of Science in Nursing. He has not even attempted to demonstrate that he cannot find employment that will permit him to maintain a minimal living standard while repaying his Federal Student Loan Debts. Under available income-driven repayment plans, a borrower with zero income would receive monthly payment adjustments anyway. Plaintiff's current unemployment does not alter the Court's determination that he has failed to demonstrate an inability to maintain a minimal standard of living while servicing his loans through reasonable budget adjustments under the *Brunner* Test.

### The Second Prong

The second prong of *Brunner* Test requires Plaintiff to demonstrate that "additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396. This prong has been characterized as "the heart of the *Brunner* [T]est" because it "reflects the congressional imperative that the debtor's hardship must be more than the normal hardship that accompanies any bankruptcy." *In re Frushour*, 433 F.3d at 401.

Courts require demonstration of "unique" and "exceptional" circumstances beyond the debtor's reasonable control that will prevent future employment advancement and affect continuing ability to repay educational debt. *In re Hixson*, 450 B.R. at 22 (citing *In re Wells*, 380 B.R. at 660). The debtor must present "any circumstances, beyond the mere current inability to pay, that show that the inability to pay is likely to persist for a significant portion of the repayment period." *In re Clavell*, 611 B.R. at 529 (citing *Nys v. Educ. Credit Mgmt. Corp. (In re Nys)*, 308 B.R. 436, 444 (9th Cir. BAP 2004), *aff'd*, 446 F.3d 938 (9th Cir. 2006)).

To satisfy the second prong of the *Brunner* Test, Plaintiff must show a "[p]ersistence of [c]ondition" which would prevent him from paying his obligations, and that such inability is likely to be long term. *In re Hixson*, 450 B.R. at 22 (citing *Wells v. Sallie Mae (In re Wells)*, 380 B.R. 652, 660 (Bankr. N.D.N.Y. 2007)). In analyzing this prong, courts underscore the "availability of an array of tailored repayment options." *In re French*, 2006 WL 2583646, at *6. The court in *In re Clavell* clarified that this prong does not require "a certainty of hopelessness" or a showing of "total incapacity." *In re Clavell*, 611 B.R. at 528-29. Rather, "when a statute requires us to make a judgment about the future we should do so based on what is likely to happen, as shown by the evidence before us." *Id.* at 529. This prong requires the debtor to present "any circumstances, beyond the mere current inability to pay, that show that the inability to pay is likely to persist for a significant portion of the repayment period." *Id.* (citing *In re Nys*, 308 B.R. at 444).

Plaintiff argues the following factors establish persistent hardship: limited promotion opportunities as a nurse practitioner, his age (currently 54), genetic predisposition to dementia, and various minor health conditions including insomnia, prediabetes, and anemia. Joint Statement ¶¶ 57, 91; Xiao SJ Motion at 14. The Court examines each assertion.

<u>Employment and Earning Capacity Analysis</u>

Plaintiff's job as a psychiatric nurse practitioner at Flushing Hospital paid $134,000 annually. This income placed him above median household income and demonstrates successful completion of career transition from accounting to healthcare. While Plaintiff claims there are limited promotion opportunities for nurse practitioners, he simultaneously acknowledges that "other hospitals may pay more than his current hospital" and that compensation prospects are "difficult to predict given the dynamic nature of the labor market." Joint Statement ¶¶ 53, 54; Xiao Motion at 14.

This acknowledgment of market variability and alternative employment opportunities undermines any claim of persistent inability to increase income. So too, does his termination of his job. Moreover, speculation about future earning capacity, without supporting evidence, cannot satisfy the demanding second prong of the *Brunner* Test. In *Hlady v. Key Bank N.A. (In re Hlady),* 616 B.R. 257, 276 (Bankr. E.D.N.Y. 2020), the court emphasized that debtors must "precisely identify their problems and explain how their condition would impair their ability to work in the future" to establish "inability to earn enough income to repay the educational loan." For example, in *In re Gesinde*, the debtor alleged racial discrimination and various medical conditions affecting employment prospects, but the court held that "a generalized claim of bias is not a basis for relief" and that without "information as to how her own medical circumstances supported relief, such as an assessment from a medical professional, no circumstances existed which precluded the debtor from repaying her loans." 2019 WL 5090080, at *6.

Plaintiff provides no evidence supporting his pessimistic projections about future earning capacity. His speculation about limited advancement opportunities in nursing contradicts his successful career transition, completion of advanced degrees, and employment in a specialized

field with documented workforce demands. His acknowledgment that higher-paying positions exist elsewhere undermines any claim that his earning capacity has reached its ceiling.

Furthermore, Plaintiff is at the beginning, not the culmination of his nursing career. He completed his Bachelor of Science in Nursing in January 2021 and his Master of Science in Nursing in May 2024, making him a relatively new practitioner in the field. Joint Statement ¶¶ 14, 17. Courts presume that earnings will increase over time, particularly for recent graduates entering their careers. *See In re Sorber*, 358 B.R. 68, 74 (Bankr. N.D.N.Y. 2006) ("there is a presumption that the debtor's income will increase over time barring any 'insurmountable barriers to the debtor's financial recovery and inability to pay.'"). Plaintiff has not overcome this presumption with evidence of circumstances that would prevent normal career progression.

<u>Health Conditions and Age-Related Arguments</u>

Plaintiff contends that his advanced age, combined with various health conditions and genetic predisposition to dementia, will limit his ability to continue working throughout the loan Repayment Period. Specifically, he cites insomnia, prediabetes, anemia, and "genetic risk for dementia" as factors supporting persistent hardship. Joint Statement ¶¶ 57, 91.

The record, however, does not support these claims. Plaintiff "does not receive regular treatment or take medications for any of these conditions," indicating that they do not significantly impact his current functioning. Joint Statement ¶ 57. His speculation about genetic predisposition to dementia lacks any current diagnosis, functional limitation, or medical assessment of future capacity. Plaintiff must show more than speculation about potential future disability to satisfy the persistence prong.

The legal standard for health-related persistence claims was established in cases like *Gesinde* and *Hlady*, which require medical evidence or professional assessment of functional

limitations. Plaintiff's failure to provide any medical documentation supporting his claimed limitations is fatal to this aspect of his argument under the *Brunner* Test. Courts require "precisely identify[ing] problems and explain[ing] how [the] condition would impair [the] ability to work in the future" rather than generalized speculation about potential health issues. *In re Hlady*, 616 B.R. at 276.

Moreover, Plaintiff's recent accomplishments belie his claims about age-related limitations. His successful completion of advanced degrees after age 50, transition to a demanding healthcare field, and employment in psychiatric nursing demonstrate professional competenece. His ability to complete rigorous graduate education while working and subsequently secure employment in his chosen specialty contradicts his speculations about age-related employment limitations.

The facts that Plaintiff relies on do not demonstrate that he satisfies the second prong of the *Brunner* Test. Other factors – not cited by Plaintiff – also show that Plaintiff cannot meet his burden under the *Brunner* Test.

<u>Employment Decisions and Career Choices</u>

Plaintiff's employment decision undermines his contention of "persistent hardship" under the second prong of the *Brunner* Test. During his graduate studies at NYU, he "quit his paid position and took unpaid internships" at the start of his third year, voluntarily reducing income while accumulating additional educational debt. Joint Statement ¶ 19. This decision to prioritize unpaid training opportunities over income generation while claiming financial hardship contradicts the requirement to maximize earning capacity.

So too does his termination of his employment at Flushing Hospital in October 2024. Plaintiff described the termination as occurring "primarily due to Plaintiff's concern of lack of

clinical supervision and certain other quality issues at Flushing Hospital." Xiao Reply at 5. However, courts have consistently held that voluntary employment limitations based on personal preferences cannot satisfy the persistence requirement. *Bush v. United States Dep't of Educ. (In re Bush)*, 450 B.R. 235, 242 (Bankr. M.D. Ga. 2011) ("Numerous courts have held that a debtor cannot meet the second prong of the *Brunner* Test where the debtor has voluntarily limited his or her employment opportunities and income due to personal choice and failed to pursue higher paying jobs").

Plaintiff acknowledged during the hearing that he has interviewed for two positions offering marginally higher compensation than his previous Flushing Hospital position. This acknowledgment demonstrates continuing employment opportunities and market demand for his specialized skills, undermining any claim of persistent inability to secure adequate employment.

<u>Availability of Income-Driven Repayment Options</u>

Plaintiff's failure to pursue available income-driven repayment options likewise undermines his claim for relief under the second prong of the *Brunner* Test. The existence of the IBR Plan that would reduce his monthly payment obligations to $928 demonstrates that flexible repayment options exist to address temporary financial constraints. Joint Statement ¶ 87.

Courts have recognized "the availability of an array of tailored repayment options" as relevant to persistence analysis under the second prong of the *Brunner* Test. *In re French*, 2006 WL 2583646, at *6. These programs are specifically designed to accommodate borrowers facing temporary financial difficulties and adjust payment obligations based on income fluctuations. The availability of such programs undermines claims that current financial circumstances will persist unchanged throughout the Repayment Period.

Plaintiff has "summarily dismissed the various loan repayment options, speculating that [he] would be unable to pay back [his] loans under any plan," but such "statements are conclusory and do not satisfy [his] burden of proof." *Id.* at *6. His failure to engage with these programs while claiming persistent hardship demonstrates that his financial difficulties result from voluntary choices rather than exceptional circumstances preventing repayment.

The circumstances presented here contrast sharply with cases where courts have found the persistence prong satisfied. For example, in *In re Clavell*, the court noted that successful persistence claims typically involve "serious illness, psychiatric problems, [or] disability of a dependent." 611 B.R. at 529 (citing *In re Nys*, 308 B.R. at 447). Plaintiff presents none of these exceptional circumstances. His health conditions are minor and currently untreated, his employment prospects remain positive despite voluntary career decisions, and his financial constraints result primarily from discretionary spending choices rather than external circumstances. The situation represents what courts have characterized as "garden-variety financial hardship" rather than the exceptional circumstances required under *Brunner* Test. *In re Lozada*, 594 B.R. at 222. The Court finds Plaintiff failed to show his circumstances are more than normal post-graduation financial adjustment.

### The Third Prong

Good faith is "measured by a debtor's efforts to obtain employment, maximize income and minimize expenses, and to undertake all other reasonable efforts to insure repayment." *In re Clavell*, 611 B.R. at 531; *In re Hixson*, 450 B.R. at 22 (same). "A failure to make payments that a debtor could and should have made may be a sign of bad faith." *In re Clavell*, 611 B.R. at 532. But the debtor's nonpayment must be evaluated in light of the circumstances confronting him. The court must look to whether "circumstances beyond [the debtor's] reasonable control have caused

his economic difficulties and have defied his genuine endeavors to achieve financial stability." *Id.* at 531. Relevant considerations include whether the debtor has "defaulted on his obligations and idly wait[ed] for the [lender] to initiate collections activity," or whether he has kept the loan servicer "apprised of the developments in his personal finances." *Id.* The debtor must "exert reasonable efforts to insure repayment." *In re Hixson*, 450 B.R. at 22. Relevant factors to such inquiry are (i) actual payments made on the loans, (ii) attempts by the debtor to seek alternative remedies to discharge, such as deferment of payment, and (iii) the amount of time between when the debt matures and debtor seeks to discharge the debt. *See In re Gesinde*, 2019 WL 5090080, at *6 (citing *Pincus v. Graduate Loan Ctr. (In re Pincus)*, 280 B.R. 303, 316 (Bankr. S.D.N.Y. 2002)).

Plaintiff argues he showed good faith by not taking out the maximum allowable student loans during his studies, completing income-driven repayment counseling, and taking steps to lower his living expenses, such as ending a gym membership and adjusting his family cell phone plan. Xiao Motion at 15-16. Moreover, he claims he has considered income-driven repayment options and the Public Service Loan Forgiveness program. *Id.* at 15. Finally, he says that he anticipated covering a significant portion of his student loan debts through the Nurse Corps Loan Repayment Program, but that the program is highly competitive and his bankruptcy filing, have hurt his chances of being accepted to it. *Id.* at 3-4. Given these efforts, Plaintiff contends that he showed enough good faith. *Id.* at 15.

Plaintiff's Rush to Courthouse

Plaintiff filed this adversary proceeding on January 31, 2024, while still enrolled in his NYU nursing program and more than one year before his first loan payment would become due on February 15, 2025. Joint Statement ¶¶ 17, 26. This demonstrates a lack of good faith. *Alderete*

*v. Educ. Credit Mgmt. Corp. (In re Alderete)*, 308 B.R. 495, 505 (B.A.P. 10th Cir. 2004) ("[A]

good faith analysis should take into account the amount of time that has lapsed between the debtor

obtaining his or her degree and the bankruptcy filing."), *rev'd and remanded on different grounds*,

412 F.3d 1200 (10th Cir. 2005). Plaintiff appears to have "rushed to the courthouse." *Compare*

*Brunner*, 831 F.2d at 397 (declining to find good faith when debtor filed adversary proceeding

seeking discharge within a month of when her loans first became due), *with Roth v. Educ. Credit*

*Mgmt. Corp. (In re Roth)*, 490 B.R. 908, 919 (B.A.P. 9th Cir. 2013) (good faith was found when

"debtor's attempt to discharge her student loans came at least a decade after they went into

repayment, and thus there was no 'rush to the courthouse'"). Here, Plaintiff did not even wait for

his loans to enter repayment status before seeking to discharge the student loan debt. He made no

effort to repay them over time.

   In *Brunner*, the Second Circuit declined to find good faith when the debtor filed for

discharge within a month of when loans first became due. 831 F.2d at 397. The court's concern

centered on the debtor's failure to demonstrate any genuine attempt at repayment before seeking

relief. Courts have subsequently developed this principle into a broader inquiry about "rush to the

courthouse" behavior that prioritizes discharge over repayment efforts.

   The analysis in *In re Roth* provides relevant precedent. There, the court noted that good

faith was more readily found when a "debtor's attempt to discharge her student loans came at least

a decade after they went into repayment, and thus there was no 'rush to the courthouse.'" 490 B.R.

908, 919 (B.A.P. 9th Cir. 2013). In addition, the Court finds analysis by the Tenth Circuit to be

instructive: a discharge sought shortly after a degree is earned

> contravene[s] the general policy that "a loan . . . that enables a person to earn
> substantially greater income over his working life should not as a matter of
> policy be dischargeable before he has demonstrated that for any reason he is

> unable to earn sufficient income to maintain himself and his dependents and to
> repay the educational debt."

*Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1306 (10th Cir. 2004) (quoting Report of the

Comm'n on the Bankr. Laws of the United States, H.R. Doc. No. 93-137, Pt. II § 4-506 (1973)).

This shows the educational benefits justify repayment obligations, and that debtors should

have opportunity to realize those benefits before claiming inability to repay. Plaintiff's filing the

Complaint while still completing his education, before entering the Repayment Period, and before

making any payments in satisfaction of his student loan debt, contradicts this basic premise and

demonstrates prioritization of discharge relief over good faith repayment efforts.

<u>Selective Debt Repayment and Financial Prioritization</u>

In addition to the timing of his actions, Plaintiff's approach to debt repayment undermines

his claim of good faith. While claiming inability to pay Federal Student Loans, Plaintiff fully

repaid his Private Student Loan of $11,800 "around June 14, 2023." Joint Statement ¶ 41.

The Private Student Loan repayment demonstrates Plaintiff's capacity to generate funds

for debt service through income or asset liquidation. *See In re Williams*, 296 B.R. at 135 (requiring

that debtor must have "dealt with her student loans through repayment, deferral or restructuring"

rather than ignoring federal obligations while servicing other debts). His failure to make any

payments toward the Federal Student Loan Debt while demonstrating ability to satisfy private

obligations undermines claims of good faith and financial incapacity.

This repayment occurred after his bankruptcy discharge in February 2023 and while he was

accumulating additional Federal Student Loan Debt for his continuing education. The decision to

allocate resources toward private loan repayment while simultaneously borrowing additional

federal funds and planning discharge does not demonstrate genuine hardship.

<u>Employment Decisions and Income Maximization</u>

After declaring bankruptcy, and after completing his Bachelor of Science in Nursing, Plaintiff could have established a payment history on his existing loans while working as a Registered Nurse. Joint Statement ¶ 16. Instead, he immediately pursued additional education, incurring substantial new debt without having made any payments on his existing obligations. *In re Williams*, 296 B.R. at 135 ("the debtor must not have ignored her obligations and must have dealt with her student loans through repayment, deferral or restructuring."). After completing his Bachelor of Science in Nursing, Plaintiff worked as a Registered Nurse earning $60,000 to $85,000 annually. Joint Statement ¶ 18. However, "at the start of his third year of nursing school, Plaintiff quit his paid position and took unpaid internships." *Id.* ¶ 19. This voluntary reduction in income while accumulating additional debt contradicts the good faith obligation to maximize income.

Courts have held that voluntary underemployment evidence lack of good faith in student loan contexts. *See In re Oyler*, 397 F.3d 382, 386 (6th Cir. 2005) (finding that debtors must make reasonable efforts to maximize income to meet their loan obligations before claiming undue hardship). Plaintiff's decisions—both his additional borrowing without addressing existing obligations and his choice to forgo higher-paying opportunities—does not demonstrate good faith efforts to repay loans that he agreed to.

Plaintiff's decision to prioritize unpaid training opportunities over income generation while claiming financial hardship demonstrates misaligned priorities. While such training may provide long-term career benefits, the decision to forgo current income while accumulating debt and planning discharge litigation shows prioritization of career advancement over loan obligations.

This continued with Plaintiff's recent termination from Flushing Hospital, which he describes as resulting from "concern of lack of clinical supervision and certain other quality

issues." Xiao Reply at 5. While Plaintiff may have legitimate professional concerns about workplace standards, his decision to leave employment rather than pursue alternative solutions while claiming inability to repay educational debt further evidences prioritization of professional preferences over financial obligations.

<u>Failure to Engage with Repayment Programs</u>

Most significantly for good faith analysis, Plaintiff has not enrolled in any income-driven repayment plan or pursued available loan forgiveness programs despite acknowledging awareness of these options. Joint Statement ¶¶ 88-89. When asked about this failure during deposition, Plaintiff stated he "does not know what to cut" from his budget to enable payments. *Id.* ¶ 90. While Plaintiff contends that he anticipated covering his educational costs through the Nurse Corps Loan Repayment Program, he admits this program is highly competitive, and his bankruptcy filing diminished his chances of acceptance. Xiao Motion at 3-4. Based on reliance on speculative future benefits, coupled with his failure to engage in repayment efforts and the timing of his discharge request, the Court finds that Plaintiff has not met the good faith requirement of the *Brunner* Test. *See Shenk v. United States Dep't of Educ. (In re Shenk)*, 603 B.R. 671, 681 (Bankr. N.D.N.Y. 2019) (finding debtors made no effort to repay his loans, and courts infer from such failure a lack of good faith effort to pay the student loans).

Courts examining good faith emphasize engagement with available repayment options as evidence of genuine efforts to address loan obligations. Courts have found a debtor's participation in an income-driven repayment plans as evidence of good faith efforts. *See In re Tingling*, 990 F.3d at 309; *In re Krieger*, 713 F.3d 882, 884 (7th Cir. 2013); *In re Mosley*, 494 F.3d 1320, 1327 (11th Cir. 2007); *In re Barrett*, 487 F.3d 353, 363-64 (6th Cir. 2007).

The Court notes that, because Plaintiff was still within the grace period when this case was filed, no payments have been made. Joint Statement ¶ 36. But the absence of voluntary payments alone is not the issue here. *Great Lakes Higher Educ. Corp. v. Brown (In re Brown)*, 239 B.R. 204, 209 (S.D. Cal. 1999) (lack of payment does not by itself preclude a good faith finding). What is notable is Plaintiff's failure to enroll in any repayment options or IDR plans. Despite having federal loan repayment plans available to him, Plaintiff has not taken any proactive steps to address his loan obligations. Plaintiff's lack of engagement with repayment solutions that could have managed his financial burdens shows a lack of good faith.

What Plaintiff has shown throughout the loan relationship evidences prioritization of personal financial goals over educational debt obligations. His filing for bankruptcy before entering repayment, debt repayment favoring private over federal obligations, voluntary income reduction during school, failure to engage with available repayment programs, and his positioning for discharge relief collectively demonstrate lack of good faith under the *Brunner* Test. At minimum, Plaintiff's focus on incurring new debt and prioritizing his expenses over making any payments on his student loans, combined with the decision to leave Federal Student Loans unaddressed and his filing of the present adversary proceeding to have his student loan discharged before completing his degree or making any payments, compels the Court to conclude that Plaintiff failed to show he made a good faith effort to repay his loans.

## Plaintiff's Remaining Legal Theories

Plaintiff advances two additional arguments in support of his motion. While not central to analysis under *Brunner*, the Court addresses them below.

First, Plaintiff contends that DOE showed bias against him in its response to the Complaint. Xiao Reply at 2. He asserts this alleged bias led DOE to overlook or undervalue the evidence he

presented regarding his financial limitations and living expenses, ultimately resulting in an inaccurate assessment of his ability to repay his student loans. Xiao Motion at 13. Moreover, Plaintiff challenges DOE's characterization of his stipulated expenses as unreasonable or unjustified, arguing that such challenges improperly dispute facts that were agreed upon as undisputed in the Joint Statement. Xiao Reply at 2, 4. However, stipulating to the existence of these projected expenses does not constitute agreement that such expenses are reasonable, necessary, or appropriate for determining minimal living standards under the *Brunner* Test. The Joint Statement establishes what Plaintiff intends to spend, not whether such expenditures represent necessities that must be accommodated when evaluating undue hardship claims. Plaintiff's argument appears to be based on his misunderstanding of law: in the current context of motions for summary judgment, DOE, as defendant need "only show an absence of evidence to support the Plaintiff's claim." *In re Benjumen*, 408 B.R. at 15. Plaintiff, not DOE, bears the burden of proving undue hardship by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Plaintiff's disagreement with DOE's legal positions and settlement posture does not establish bias. DOE have no obligation to accept settlement terms proposed by Plaintiff, and their assessment of case strength may differ from Plaintiff's expectations.

Second, throughout his motion, Plaintiff appears to be advocating for a different standard of the undue hardship analysis under section 523(a)(8). For example, Plaintiff urges the Court to consider his "significant negative net worth situation" and his desire to create a "financial buffer for unforeseen financial needs." Xiao Motion at 16-17. Plaintiff refers to "essentially zero" assets other than perhaps a couple months of living expenses. *Id.* at 17. This claim does not materially affect the undue hardship analysis, as courts focus primarily on income and expense rather than asset liquidation for ongoing debt service. Plaintiff appears to be arguing the Court should apply

that guidance and adopt a more flexible approach akin to that adopted by the Eighth Circuit in *Long v. Educ.Credit Mgmt. Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir. 2003).[22] To the extent Plaintiff asks the Court to consider "other relevant facts and circumstances surrounding each particular bankruptcy case" and "past, present, and reasonably reliable future financial resources" *id.,* the Court declines to do so.

## CONCLUSION

The Court denies the Xiao Motion. The Court grants the DOE Motion, and dismisses the Complaint. Plaintiff's Federal Student Loan Debt is not dischargeable under section 523(a)(8) of the Bankruptcy Code.

IT IS SO ORDERED.

Dated:  August 30, 2025
      New York, New York

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge

---

[22] In part, in *In re Long,* the Eight Circuit stated as follows:

In evaluating the totality-of-the-circumstances, our bankruptcy reviewing courts should consider: (1) the debtor's past, present, and reasonably reliable future financial resources; (2) a calculation of the debtor's and her dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. Simply put, if the debtor's reasonable future financial resources will sufficiently cover payment of the student loan debt-while still allowing for a minimal standard of living-then the debt should not be discharged.

*In re Long*, 322 F.3d at 554-55.